## DEVLIN'S CASE.

*New York Common Pleas; before Hon. D. P. Ingraham, August,* 1857.

HABEAS CORPUS.—JURISDICTION.—TITLE TO OFFICE.—FORM OF WARRANT.

A party committed to prison (under 1 *Rev. Stats.,* 115, § 61), for default in delivering up books and papers appertaining to a public office, pursuant to an order of a judge under the statute, is entitled to his discharge on habeas corpus, unless there is no doubt of the jurisdiction of the judge to make the order for the delivery of the books, &c.

The decision of a committing magistrate that he has jurisdiction over the proceedings before him, does not preclude an officer before whom the party committed may be brought on habeas corpus from inquiring into the jurisdiction.

The title to a public office cannot be tried in proceedings instituted under the

---

\* Reported, *Ante,* 276.

Revised Statutes to obtain the delivery of books and papers appertaining to
the office.

Where it appears by the papers submitted on an application for an order for the
delivery of books and papers appertaining to an office, that the title of the ap-
plicant to the office is doubtful, or that it is contested with color of right, the
officer has no jurisdiction to grant the order.

The governor is not authorized, by Laws of 1849, ch. 28, to fill a vacancy in the
office of street commissioner in the city of New York.

It seems that in a warrant of arrest and search-warrant granted on default to com-
ply with an order for delivery of books and papers appertaining to an office,—
the words "the books and papers appertaining to the * * office" are an in-
sufficient description of the books and papers to be delivered; and that a party
cannot be held, nor a search made, on a warrant containing no more precise
description.

Habeas Corpus, issued on behalf of Charles Devlin, held in
custody by the sheriff of the city and county of New York.

Charles Devlin having been taken into custody by the sheriff
of the city and county of New York upon a warrant of arrest
issued by Mr. Justice Peabody, of the Supreme Court, a writ of
habeas corpus was issued in his behalf on the petition of Richard
Busteed. For the history of the proceedings which led to the
issuing of the warrant of arrest, see Conover's Case, (*Ante* 73;
S. C., *Ante*, 182); The People *on rel*. Devlin *a*. Peabody (*Ante*,
194). The facts important to the present proceeding are stated
in the opinion.

*Daniel E. Sickles*, for the petitioner. We move for the dis-
charge of Devlin under section 56 of the Habeas Corpus Act
(2 *Rev. Stats.*, 801), and the chief questions to be considered
are;—1. Whether the tribunal under whose warrant the impris-
onment was directed had jurisdiction in the case, and to issue
the warrant;—and 2. Whether the warrant shows a cause of
imprisonment.

I. It is not only the right but the duty of the judge to inquire,
in this proceeding, whether Mr. Justice Peabody had jurisdic-
tion to issue the warrant under which Devlin is held in custody;
for if he had no such jurisdiction, then the warrant is utterly
void, and the imprisonment is unlawful (1 *Hill*, 130; 4 *Den.*,
118; 5 *Hill*, 164; 4 *Barb.*, 31).

II. Jurisdiction in Mr. Justice Peabody is not to be presumed;
that presumption only exists in relation to superior courts, and

not to inferior jurisdictions, not proceeding according to the course of common law. (Bloom *v.* Burdick, 1 *Hill*, 138.)

III. There is no warrant whatever for alleging that the proceeding by Conover against Devlin was in the Supreme Court. It was, and is, a summary proceeding before the justice, in which he possesses no more dignity nor power than would have attached to the county judge, if such proceedings had been commenced before him.

These propositions, I suppose, will not be questioned. The respondent must show affirmatively that Mr. Justice Peabody had jurisdiction in this case to enter upon the proceedings—to make the judgment order which he made, and to sign the warrant that he issued. In reference to the superior courts, jurisdiction is sometimes presumed; but we maintain that Mr. Justice Peabody, although a judge of the Supreme Court, was not sitting as a court, but as a magistrate, acting as any county judge might have acted, and without any of the attributes of any court, much less of the Supreme Court. Your Honor is familiar with the distinction which we make between Mr. Justice Peabody, sitting in the Supreme Court, and exercising all the powers of that court, and Mr. Justice Peabody, *ex officio*, sitting under a special statute, as he did when he ordered the arrest of Devlin. In this proceeding, he was the presiding officer of a tribunal judicial in its nature, but an inferior tribunal; and, therefore, under the cases, his jurisdiction cannot be presumed, but must be affirmatively shown, and expressly shown, for every act that he did. He had not the power to do one solitary act, no matter how insignificant—much less an act which involved the loss of liberty, of office and estate, without his express authority being found in the statute from which he derived his powers—large or small, much or little. As to the extent of that authority—what he could do, and what he could not do—I will come to that presently, in its proper order.

IV. But a want of jurisdiction over the person of a citizen may be alleged and proved, to secure his liberty, as against any court. So a decree of the vice-chancellor was, in our Court of Appeals, declared to be void because the bill of complaint before him did not show jurisdiction. (Burckle *v.* Eckhart, 3 *Comst.*, aff'g, S. C., 3 *Den.*, 279; Habeas Corpus Act, § 56, subd. 1, 3, 4, 6; Harrington *v.* The People, 6 *Barb.*, 607.)

V. The decision of Mr. Justice Peabody, that he had jurisdiction, is not conclusive. If any such rule prevailed, the question of jurisdiction in judicial proceedings could never be inquired into on any species of review; for, by deciding to act, the magistrate's tribunal always declares that it has jurisdiction. (Bennet *v*. Burch, 1 *Den.*, 141.)

VI. In this case it appears distinctly and positively on the face of Conover's complaint and affidavits, that Mr. Justice Peabody had no jurisdiction, because preceding any action by the justice, Conover had to show that he was the "successor" of Joseph S. Taylor to the office of street commissioner. 1. He shows that he was not such successor, because he claims exclusively under an appointment by the governor, who had no power to make any such appointment. 2. He shows that if he were really, and in law, street commissioner, he had full possession of the office and its appurtenances. He states this in his complaint, and shows no case under the statute but a mere trespass, which cannot be redressed in this way. 3. He shows that no books, &c., came to the possession of Devlin during any vacancy in the office.

This brings us to the principal question in the case.

The petition of Mr. Conover alleges that the governor appointed him street commissioner. That is the only glimpse of title which he shows. Now, in order to see what sort of case a party had a right to bring before Mr. Justice Peabody, it is necessary to look to the statute, to see what power he had, with an incidental glance at the adjudications of the Supreme Court with reference to those powers. It is found in 1 Revised Statutes, 4 ed., 335, art. 5. The statute may be considered under two general heads. The first half dozen sections relate to the case of a person who shall be removed, or whose term of office shall have expired, requiring him in such case to deliver over to his successor all the property and books in his custody appertaining to the office—a provision not relating to this case; for here the term for which Mr. Taylor was elected had not expired, nor had the term for which any person was appointed his successor, expired. The second branch or subdivision is found in section 66, which provides, that in case a person elected or appointed to an office shall die, or his office shall in any way become vacant, and the books or papers appertaining to such office

shall come to the hands of another party during any vacancy therein, the successor to such office may demand and obtain such books and papers from the person having them in his possession. This section contains all the law under which Judge Peabody acted. Now, the broad, general question is, whether under that section any proceeding can be taken, directly or indirectly, to try the title to an office; secondly, to decide who should take possession of the office; and thirdly, whether, under that section, the books and papers of an office can be taken from the custody and possession of a person appointed to the office, and in fact exercising and discharging its functions, and recognized as such by the community in which he resides and acted. They have done all three of these things, by their proceedings before Mr. Justice Peabody, as we shall show. They have practically settled the question as to the title to the office, although all the time disclaiming any intention or right to do that. They have tried and settled the question as to the possession of the office, which is quite as important as the title, and, according to Mr. Justice Peabody, even more so, as we shall show by his opinion; and they have seized and taken into their own control the books and papers of the office, from a person actually discharging the duties of the office, holding a regular appointment to it, and recognized as the officer *de facto* by the entire corporation, in whose name, and on whose behalf, and as whose agent, he is appointed to act. Now, the principal question is, whether that section of the statute—because it is there we must look—conferred upon Mr. Justice Peabody these extraordinary powers. It has been repeatedly decided, in cases arising not only under this statute, but upon mandamus and in other proceedings, that there is but one lawful mode—but one mode known to the law—by which a party in office *de facto*, with color of title, holding possession and claiming possession under it, and exercising the duties, can be ousted, and that is by *quo warranto*. It has never in any adjudicated case been decided, that this section of the statute, or any part of this statute, can be applied to such a case as this is conceded to be upon the papers.

Conover, by his petition, by the very first paper that was presented to Mr. Justice Peabody, showed conclusively that the justice had not a shadow of jurisdiction. At the very inception

of the proceeding—at the very instant of its birth—when it was disclosed to the eye of the judge called upon to exercise his functions, it was apparent and patent that he had no jurisdiction, because the petitioner invited him to try the question of title to the office. That petition, in substance, says to Mr. Justice Peabody:—" Sir, here are two rival claimants to an office, one claiming to be appointed by the governor, another claiming to be appointed by the corporation. The one who derives his appointment from the corporation claims the books and papers, as incident to his office; I, who have been appointed by the governor, want to take them from him, because I deny he is rightfully appointed; I deny he is rightfully in office; I deny it, because the corporation has no right to appoint him, and because I maintain the right of the governor to fill this office." This is the issue which Mr. Conover, through his counsel, presents before Mr. Justice Peabody; and the petition should have been dismissed by Mr. Justice Peabody, upon our objection, made at the very outset, that he had no jurisdiction in such a case. It should have been instantly and summarily dismissed. I need not go over all the cases to show that it is utterly foreign to the whole theory of our jurisprudence to settle disputes in regard to the right to a public office in this summary way. From the very beginning of our government down to. the present times, from 3 Johnson's Cases down to the last volume of Barbour, the reports are full of refusals by the courts to entertain such questions in any summary form, not even by mandamus, or in any other mode than by *quo warranto*, a remedy specially adapted to the case, where all the merits arise, and where the party has the right of trial by jury—*the right of trial by jury*, without which a man cannot be deprived of office or estate, and ought not to be.

This petition is also defective in other respects, to which I shall presently call the attention of the court, for it does not bring the case within section 66 of the statute in regard to the time and circumstances under which books and papers must come into the possession of a party, to render him amenable to its provisions. It requires that such possession shall have been acquired during a vacancy in the office. No such allegation is made. And bear in mind also, if your Honor please, that no possession is charged upon Mr. Devlin of those books and pa-

pers, except a possession incident to the office which he claims. He is not charged with holding them under a claim of ownership, or tortiously, or as a mere trespasser, or as a special custodian; not a corporeal possession; not that they were in his pocket; not that they were in his house; not that he had them locked up, inaccessible to any one but himself; but that he asserted a constructive possession of them, appurtenant to a franchise which he claimed a right to hold. Now, need it be said that this section of the statute has no sort of application to such a case as that? Most obviously it was intended to take the books, papers, maps, or other property of an office, from persons who had acquired them in some manner or other different from that possession which follows the incumbent, *de facto*, of an office; from some clerk in whose hands, or to whose house, books may have gone from a public office; some person other than the actual incumbent of the office, no matter who he may be or how his possession was acquired; or where the incumbent of the office was a mere intruder, and the petitioner set forth a clear title to the office, free from all reasonable doubt: the theory of the matter being that the books and papers of a public office are material to the office; necessary to the discharge of its duties; and that an urgent necessity may arise and exist for the immediate use of them, for the public interest and welfare.

Now, this is precisely the view of this statute which has always been taken by the courts: that it has no application at all to a disputed question between parties as to the right to the office, and where the possession of the property sought for results from, and is dependent upon, the success of the one or the other in maintaining his right to the franchise. No one pretends—Mr. Conover, in his petition, does not allege—that Mr. Devlin asserted any other description of claim to the possession of those books, or the use of them, except *ex officio* as the street commissioner. Conover himself sets forth in so many words, that Devlin claims the custody of the books for that reason; not claiming that he owned them, not claiming any exclusive right or use to them, but that they were in the office, in the apartments which he occupied as a public officer. Again, Conover himself, the moment he asserted upon his oath, before Mr. Justice Peabody, that he was the street commissioner, that he had been appointed by the governor, and that he had entered upon the duties of the

office on a certain day—by these very allegations Conover asserted and showed himself to be just as fully and completely in possession of the books and papers of the office as Devlin could possibly be, assuming that he, Conover, was rightfully appointed, that his term of office had begun, and that he had duly qualified himself to enter upon the duties of the post. What I mean to say is this: that inasmuch as Devlin, according to the petition, asserted only a right to the possession of those books and papers as incident to the office he claimed—the office being the principal claim—that Conover alleging the same right to the office, was to be deemed equally in possession of the books and papers; because Devlin's was only a constructive and incidental possession, and Conover, according to his own petition, had equally the very same constructive and incidental possession; and for that reason the real and only issue between the parties being the right to the office, he was precluded from any ground bringing him within the jurisdiction of Mr. Justice Peabody. The answer was obvious: " Why, sir, if you are entitled to the office, enter upon it and discharge the duties. If you claim this office, and some one else is in it, who claims to be rightfully appointed, and there is a reasonable doubt about the title, the law gives you but one remedy, and that is the remedy of *quo warranto*." This view of that statute has been frequently presented to the courts, and was well put in the case of The People *v.* Stevens (5 *Hill*, 626.)

Now, certainly the remedy by writ of *mandamus* in the Supreme Court, where you may form issues of fact, may have a trial, and may claim the protection of all the powers of the court, is a much higher and more dignified proceeding than the summary one prescribed in this statute; and *a fortiori*, if a writ of *mandamus* is not allowed to supersede the writ of *quo warranto* as the mode of claiming a public office where there is a color of right, no court will ever allow the almost mechanical act, which a judge is, *ex officio*, permitted to do under this statute, to supersede the use of the writ of *quo warranto*. The same authority says, that the relator, under these circumstances, should first have established his title to the office, and then his right to the books and papers will follow as a matter of course. That is precisely what Conover should have done. When he found Mr. Devlin was in office, inducted there by the corporation, recog-

nized as its officer and agent, in whose behalf he was to act—when Mr. Conover found that to be the case, and that he rested upon the abstract claim of right to be the incumbent of the office —why, it was the plainest, the most palpable instance of the proper application of the writ of *quo warranto* that could be presented to any lawyer; and after he had prosecuted his writ of *quo warranto*, and established judicially his title to the office —when that became matter of record, then any person other than himself in the office was a mere intruder—the veriest trespasser in the world—without color, or shadow, or vestige of right; and any possession that he might have or assert to books and papers, would not be a respectable and appropriate claim of possession as incident to the right of office, but would be a possession which, if not felonious, would be at least *quasi* criminal, and just such a one as this statute was designed to punish and to terminate. Carpenter's Case (7 *Barb.*, 37) presented precisely the state of things which Conover disclosed in this controversy before Judge Peabody. Here, to say the very least, a *reasonable doubt* existed as to the title; it was suggested upon the petition itself, by which his proceedings against Devlin were originated; it presented the *issue of title to the office*, and that is an issue which the courts, in all their adjudications, say cannot be tried in this proceeding. It is apparent, therefore, that Mr. Justice Peabody never had jurisdiction of the issue upon which he proceeded to convict and imprison Devlin for holding an office under corporate appointment, as against the appointee of the governor.

Next, we say that the justice had no right to proceed upon the petition, because it disclosed no other title to the office in the applicant than an alleged appointment by the governor to this office, in virtue of which, and by force of the commission issued by the governor, he claimed that the justice should proceed and put him in possession of the books and papers. We say that the governor had no right to confer the appointment on Mr. Conover, and for that reason the justice had no jurisdiction to proceed.

[The counsel here proceeded to discuss elaborately the question as to relative validity of the two appointments, which portion of the argument is omitted.]

VII. I proceed now to look at the warrant. It is void on its

face.  The process in such a proceeding must recite all the facts essential to show jurisdiction in the officer awarding it.  (Bowers v. The People, 4 *Johns.*, 292 ; Germond v. The People, 1 *Hill*, 343.)  This is especially the case where a warrant emanates from a special jurisdiction, such as Judge Peabody exercised; every step he takes must go side by side and step by step with the statute, and must bear on its face a full and complete justification to parties acting under it.

1. The introductory part of the warrant contains a recital of the preliminary proceedings before Judge Peabody.  I come at once to the statement of the adjudication of Judge Peabody, and upon which the order of imprisonment is based.  After reciting that Mr. Conover came before him, that Conover presented a petition setting forth that he claimed the office as appointee of the governor, and that Devlin claimed under an appointment from the corporation, &c., the judge goes on to declare :

" And the said Devlin not having made oath that he has truly delivered to the said Conover the said maps, books, papers, and documents; and it appearing to the said justice, that the said Conover is the successor to such office of street commissioner of the city of New York; and it appearing that the said books, maps, papers, and documents are still withheld, and that the said Devlin omits and refuses to deliver up the same,—these presents are, therefore, to command you, the sheriff, &c., to take the body of the said Charles Devlin, and commit him to the jail," &c.

We say, in the first place, that Judge Peabody does assume, as appears by this warrant, to adjudge and declare that Conover is the successor to the office of street commissioner, and thereby decides the question of title, presented by Conover for his adjudication ; and although my learned friends on the other side are very careful to seize every occasion to say that they did not intend to try the question of title, yet on their own petition, presented to Judge Peabody, they make up an issue of title to the office ; and when they draw a warrant for his signature, they are careful to insert in the warrant an express declaration that Conover is adjudged to be the successor to the street commissioner's office.  What more could the Supreme Court do on *quo warranto* than to say that Daniel D. Conover is successor to the street commissioner ?  That would be the language of the court,

if the other side would have the candor to seek its judgment, and the fortune to get it—one of which is as likely to happen as the other. What I have read embodies all of the warrant, except what is mere recital—all upon which the tribunal predicates its mandate to the sheriff.

2. The second ground of objection to the warrant is, that it does not show that any books or papers ever came into the possession of Devlin, belonging to that office. It does not appear that the judge found any such fact, nor does the recital show that Conover alleged any such fact. Now, this was the most essential fact that Judge Peabody was obliged to find, conceding that he had jurisdiction of the case, of the parties, and of the subject-matter. It was not proper for him to issue a warrant of arrest, or search-warrant, until he judicially ascertained the fact that Devlin had in his possession the books and papers in question. You cannot adjudge that a man has withheld a thing, and punish him for withholding it, until you have first found him guilty of taking it, and having it in his possession. These two acts must precede the act of withholding. The judge says: "It appearing," &c., that "the said Devlin omits and refuses to deliver up the same," &c. Why, he might as well be convicted of not giving up the City Hall, or the White House at Washington, or any thing else he never possessed. The warrant must show that he acquired them. Nor is this difficulty a mere accidental one; it is not a mere technical criticism. It is one that could not be obviated if they had the opportunity to make out a new warrant. The *judgment* of Mr. Justice Peabody does not establish that these books or papers came into the possession of Mr. Devlin, or that, after having so come into his possession, he refused to give them up when duly demanded, and withheld the same. I say, therefore, that in the warrant issued by Mr. Justice Peabody, there is this fatal defect.

3. It does not appear from the warrant that Mr. Justice Peabody adjudged that any books or papers of the office of street commissioner came to the hands of Devlin. But if, by any means, it could be held that such an adjudication is stated in the warrant, it is clear that it is not alleged to have been determined that such books or papers came to Devlin's possession during a vacancy in the office, or before the proceeding before Mr. Justice Peabody was commenced, or that such books and papers were

before that time demanded of Devlin. (Bennac *v.* The People, 4 *Barb.*, 31, 164; Habeas Corpus Act, § 56.)

Both the judgment and warrant are entirely silent as to the demand which the statute makes a condition precedent throughout. Under the statute two things must happen, and appear affirmatively: First, that the books and papers in question came into the possession of the person against whom the proceeding is had; and second, that a demand has been made of such books and papers from the person having the same in his possession. These are two of the preliminary facts necessary to obtain jurisdiction. They must precede a search-warrant; they must, above all, precede a warrant depriving a man of his liberty.

4. Moreover, the warrant is general. Neither that process nor any paper before Mr. Justice Peabody specifies the books or papers sought to be obtained. Such a general warrant is void. (See Bill of Rights, 1 *Rev. Stats.*, 93, § 11.)

This is a fatal error in the warrant of arrest, because Devlin is sent to prison for not complying with a direction so vague, a command so general, that it is not within human possibility to comply with it, since there is no way of determining when the books and papers have been delivered. They are in no way described. It is just as fatal a defect as it would be in a writ of replevin directed and sent to the sheriff in a suit between John Jones and John Smith, in which the sheriff would be directed "to take from John Smith the property of John Jones, the plaintiff, and restore it to him." These gentlemen have in their hurry followed mechanically the words of the statute, "books and papers." Statutes are generally descriptive of the subject-matter; but when you come to act under the statute, you must particularize what you want. If the statute authorizes you to institute a judicial proceeding by which you are to get into your possession your property in the possession of another, you do not say in the complaint, "Mr. So-and-So has got some of my property, and I want it, and if he does not give it, I want you to lock him up." That would be reducing legal proceedings to a simplicity not in accordance with the civilization of the times. No; in this proceeding you must specify, with reasonable precision, the books and papers that you charge the party with having in his possession. And there is no difficulty in this. Are these "books and papers" locked up in an iron chest, or

Devlin's Case.

buried in a cellar? No; they are the public records of a public office, to which every citizen has access—daily and hourly access—which are by law open to the examination and perusal of any and every body who goes in an ordinary and proper manner to consult them, at reasonable hours;—no hardship, no difficulty, no obstacle. In the reason of the thing, in the very nature of the proceeding, it is indispensably necessary that they should specify the books, papers, and documents they want, with reasonable certainty. I do not mean to say, that if there were an error in the description of some one book, or paper, or map, this would vitiate or affect the proceeding. It is not a technical objection I urge; it is one of substance and reason, necessarily arising out of the very nature of the case, because, upon any other rule, if you hold that a vague, general description, like this, is sufficient, it is never possible to ascertain when the exigencies of the search-warrant, or warrant of arrest, are satisfactorily complied with. Your Honor will observe this mandate to the sheriff:

"These presents are therefore to command you, the sheriff of the city and county of New York, and you are hereby commanded, to take the body of the said Charles Devlin, and commit him to the jail of the city and county of New York, there to remain until he shall deliver *such books and papers*, or be otherwise discharged according to law."

That is a general warrant, if there ever was such a thing. It is obnoxious to all the denunciation which the history of England and this country show has been heaped on imprisonments under general warrants—just such a general warrant as has hastened revolutions, just such a one as the people of these States, in every instance where they have formed a constitution or a bill of rights, in their jealousy of legislative and executive encroachment, have carefully and sedulously guarded the citizen against. In chapter 4 of 1 Revised Statutes (p. 302), our Bill of Rights declares:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, ought not to be violated; and no warrants can issue but upon probable cause, supported by oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized.*"

5. We say in addition, that this warrant purports to have been issued under an adjudication made in the Supreme Court, whereas, as already shown, Mr. Justice Peabody acted only as a magistrate in a special and summary proceeding. Your Honor will look in vain throughout this warrant, either in the recital or in the adjudication, or in the mandate to the sheriff, for the slightest reference whatever to the statute under which the officer acting derived all his power. There is no averment whatever, indicating the nature of the proceeding which he entertained, and which he was executing; we suppose it is a fatal defect in the warrant, that it does not show on its face the source of the authority exercised, but, on the contrary, purports to be, so far as it conveys any notion at all of the authority upon which it proceeds—the act of the Supreme Court. Let me read the clause of the warrant which alone contains the slightest allusion to the nature of the authority issuing it :

"Whereas, at the City Hall of the city of New York, on the 19th day of June, 1857, complaint was made to the undersigned, one of the justices of the Supreme Court of the State of New York, setting forth," &c.

Have we been referred to any power in the Supreme Court which authorizes any such warrant to be issued? Of course not. The Supreme Court has no such power. That is conceded. A justice of the Supreme Court exercising that office has no power which the court does not possess. That is indisputable. But the statute does provide that certain classes of officers—persons holding the place of judges of the Supreme Court, or holding the place of county judge—may, acting under the statute, and in virtue of its provisions, initiate and conduct to its conclusion a certain statutory proceeding. Certainly this warrant does not limit itself to any such specific functions, nor does it repose itself for authority on the power given by that statute. It seeks rather to acquire sanction and respect, by arrogating to itself something of the dignity and power of the Supreme Court of the State. But in doing that, it strikes a fatal blow at its own existence. I am not aware whether it appears upon this record, but it is on record in this controversy, that in point of fact this warrant was made out and signed at special term of the Supreme Court. I mention this, because it is in unison with the theory on which the warrant is drawn. It may be that my learned friends intend

to disclose some newly discovered branch of jurisdiction of the Supreme Court. We are bound so to believe, because the warrant itself is silent as to the statute under which we supposed they were proceeding. It does not purport to proceed from a limited jurisdiction, but reads just as if it emanated from the Supreme Court, and as if those who drew and issued it intended to claim for it the respect, the sanction, and the authority of the Supreme Court. Let us apply a fair test to this warrant. I say, if the proceeding had been in the Supreme Court—if the statute ordered it to be prosecuted there—if it had been conducted there from the beginning to the end, and the warrant had been issued from that court, under its seal—it would have then contained on its face exactly what it now does—nothing more and nothing less. It would have said that all these proceedings took place before one of the justices of the Supreme Court of the State of New York. The recital, that Mr. Justice Peabody was a justice of the Supreme Court, might not vitiate the warrant; but the omission of any averment showing from what authority the warrant does proceed, considering that it emanates from an inferior tribunal, of limited jurisdiction, is a fatal objection.

VIII. These points embrace the grounds upon which we move for the discharge of Mr. Devlin. We have shown satisfactory reasons for his discharge under the two heads indicated. We have proved that Mr. Justice Peabody had no jurisdiction of the matter before him. We have shown that this want of jurisdiction appeared upon the petition itself, because it presented on its face an issue with regard to the title to the office, which all the cases show he could not try; and because the petitioner could only come before him as the successor to the office, which on the face of the petition it was shown he could not be, without bidding defiance to the laws of the State and the constitution, inasmuch as he claimed an office from a source which the law and the constitution forbid to make the appointment; and further, because it appears upon the petition that the person from whom he sought to take the books and papers (Mr. Devlin) held possession of them only by virtue of his right to the office itself, and that the petition affirmatively shows that that right was asserted by Devlin to emanate from the corporation of the city of New York—the only power which, according to the constitu-

tion and charter of the city, could fill the office; and, we suppose, that upon the cases cited, and upon the statute itself, it is entirely clear and indisputable, upon the state of facts presented, that Judge Peabody could not proceed in the summary manner contemplated by this statute, but that the parties were left, necessarily, to the well-known and recognized proceeding at law, to try title to an office—a writ of *quo warranto.*

*David Dudley Field,* opposed.—I. The only question that can be raised is, whether Mr. Justice Peabody had color of jurisdiction (Matter of Prime, 1 *Barb.,* 341).

II. Every jurisdictional fact necessary to sustain the jurisdiction is to be deemed established; for the judge issuing the warrant had exclusive authority to determine those facts.

III. The warrant of search recites all the facts necessary to justify it, and those recitals cannot be contradicted.

IV. If, however, it were proper to go into proof of the facts recited, or of any other facts, the respondent has satisfactorily shown the truth of all the recitals, and of every fact necessary to establish the jurisdiction.

V. Three facts only were necessary to confer jurisdiction :— 1. That a person (Taylor) elected to the office had died; 2. That another (Conover) had become his successor; 3. That a third (Devlin) had books or papers belonging or appertaining to the office. These three facts were alleged and were proved. And if they had not been proved, the wrongful finding of the facts could not be reviewed on habeas corpus.

VI. But it is said, that though the officer may have acquired jurisdiction at first, it was afterwards taken away, because it appeared in the progress of the case that the books and papers did not come into Devlin's hands during the vacancy in the office. This objection has no foundation in law :—1. Because a jurisdiction once acquired could not thus be taken away.  2. Because the successor to an office has a right to the summary remedy provided by the statute to put him in possession of the books and papers, by whomsoever held or whomsoever taken. The language of the act is general, that if " any books or papers belonging or appertaining to such office" shall come to the hands of any person, the successor to such office " may demand such books and papers from the person having the same in his pos-

session" (1 *Rev. Stats.*, 125, § 56). There is here no qualification as if the words " during the vacancy in the office" had been inserted after the word "shall." On the contrary, it is very clear that such an interpretation was not intended, for two reasons : The policy of the law was to give to a new incumbent the books and papers of the office, wherever they might be found; otherwise the original purloiner might defeat the incumbent by delivering the books which he purloined during the vacancy to another person as soon as the vacancy is filled. The search-warrant to be issued commands the books to be taken from any place designated in the warrant, without any qualification of their having been taken to those places during the vacancy. When the books are brought before the officer, he inquires if they belong to the office, and if so, delivers them to the successor, whether they were taken during or after the vacancy. 3. The objection has, moreover, no foundation in fact.

VII. The only question, therefore, is this : When the warrant was signed, had Mr. Justice Peabody acquired jurisdiction to determine whether he should sign it or not? 1. Now, that learned judge—one of the Supreme Court—the highest court of original jurisdiction in the State, one that supervises all inferior tribunals, the Court of Common Pleas included, controlling them by mandamus, prohibition, and the like—has decided, as a matter of law, that he had jurisdiction. And although it may be true that every other court or tribunal, high or low, has a legal right to inquire into the jurisdiction of every other tribunal, however high, yet the comity of courts, and their due subordination, require that one should respect the judicial decision of another, especially of a superior judge. A judge of the Supreme Court is of the same authority as the first chancellor. Would it have been thought proper for the first judge of a Court of Common Pleas to sit in review of the decision of the chancellor, though made in a special proceeding? Would not the first judge rather have said, " My opinion might have been different, if the question were new, but I defer to the opinion of the chancellor ?" A judge of the Supreme Court cannot exercise an inferior office. He cannot be a commissioner. The constitution forbids it. "They shall not hold any other office or public trust." (*Art.* 6, § 8; 7 *Hill*, 19; 2 *Den.*, 335; 2 *Kern.*, 406.) If, therefore, the learned judge of the Common Pleas should be of opinion that

the learned judge of the Supreme Court had not, what he decided he had, jurisdiction, it would be but opinion against opinion; the opinion of an inferior judge weighed against the opinion of a superior, first delivered; an inversion of judicial order which can hardly be supposed.

VIII. But suppose the judge here to disregard entirely the decision of the judge of the Supreme Court upon the law, he cannot disregard his decision upon the facts. What facts, then, had been alleged before Mr. Justice Peabody, and passed upon by him, before he signed the warrants? That Mr. Conover had been duly appointed by the governor, and commissioned under the great seal of the State, as street commissioner of the city of New York, had accepted the office, taken the oath, filed the bond, and entered upon the possession of the franchise. Devlin's counsel must show that the allegation of these facts did not give the judge of the Supreme Court the power to "inquire into the circumstances;" for if he had that power, then the power to issue the warrant followed, though he should have committed a thousand errors in issuing it. To show this, they must make good three positions, neither of which they can maintain. They cannot make good this first position—That the allegation that a person had been duly appointed to an office does not give jurisdiction to inquire whether he has thus been duly appointed. Then they must make good this second position—That under no conceivable circumstances whatever could the commission of the State, under its great seal, signed by the governor and secretary, make a person successor to the office of street commissioner. Then they must make good also this third position—That possession of the franchise, taken and enjoyed under such a commission, could not give the person thus in possession a right to the official books. The first position is untenable. The claim of a due appointment gives the right to judge whether it be so. It is no answer to say that it is legally impossible that a due appointment can be made by a governor, for that is the very question to be decided; and that is a judicial question, upon which the judge must pass one way or the other; and the right to pass upon that question is itself jurisdiction. (Matter of Prime, 1 *Barb.*, 341; Davis *a.* Mayor, 1 *Duer*, 451; People *v.* Sturtevant, 5 *Seld.*, 263.) The second position is equally untenable. It is not only possible that the governor might, under some cir-

cumstances, have the right to appoint the street commissioner, but he had already the right to do so under the circumstances of this case.

[The counsel here proceeded to urge the grounds on which it was contended that Conover and not Devlin was entitled to hold the office of street commissioner; which portion of the argument we omit.]

The third position is also untenable. Under the commission Mr. Conover could become, by permission, officer *de facto*, even if he could not have become officer *de jure*. (People *a.* Welch, 14 *Barb.*, 259; People *a.* Crane, 16 *Barb.*, 370; Tappan *a.* Gray, 9 *Paige*, 509; Boardman *a.* Halliday, 10 *Paige*, 232; Plymouth *a.* Painter, 17 *Conn.*, 585; Weeks *a.* Ellis, 2 *Barb.*, 324.)

*William Curtis Noyes*, on the same side.

*Charles O'Conor*, in reply.—I. The statute authorizes the proceeding only against a predecessor who has quit and surrendered the office, or against one in possession of some book or paper taken possession of by himself or some other during a vacancy. Admitting, for the sake of argument, that Daniel D. Conover was duly appointed and in actual possession of the office, with its books and papers, as alleged by him before Judge Peabody, when Mr. Devlin was merely a trespasser, intruding upon him and forcibly seizing his papers, the statute does not apply to such a case.

II. The proceeding before Judge Peabody was inapplicable to the case for two other reasons:—1. Books and papers used by the official agents of a corporation, and kept in the rooms belonging to such corporation, are not "books or papers in the custody of an officer or in any way appertaining to his office," within the sense and meaning of the act. (1 *Rev. Stats.*, 124, *art.* 5; Frost *a.* Brisbin, 19 *Wend.*, 12; Laval *a.* De Liesserline, 4 *McCord*, 68, 71.) 2. The statute is admitted on all hands to be applicable only to a case where the office was not in possession of the applicant (5 *Hill*, 633). Yet Conover's original complaint neither averred facts showing a legal title from which possession might be presumed, nor stated, as a fact, that he had actual possession of the office.

III. This defect in the original complaint could not be law-

fully supplied by proofs given subsequently to the issuing the order on Devlin to show cause; but if it could have been so supplied, then the subsequent affidavits of Conover, especially when connected with their express and implied admissions touching Devlin's acts and title, do show a case not within the statute, in the following respects :—1. Conover's affidavits disclose the case of a contested succession, and that, legally or illegally, he was, in fact, held out of the office, and denied the means of exercising any of its functions, by sundry agents of the corporation. Then he was not officer *de facto*, within any definition of that term known to the law. An officer *de facto* is one actually exercising the functions of the office with the apparent acquiescence of the appointing power, under color of a lawful election or appointment. 2. The last affidavit, made by Conover himself on July 10, 1857, expressly admits that all the books and papers were in their rightful and proper places of deposit. They could not rightfully, lawfully, or with safety to the public interests, be removed from those places; and the fact asserted by Conover, that, while in their proper places of deposit, they were out of his possession and beyond his control, was conclusive evidence that he was not in possession of the office. 3. This statute was never intended to sanction the removal of public papers from the proper places of deposit provided for their safety and security by the public authorities. Until the claimant of an office by *quo warranto* or otherwise has acquired actual control of the office, in the popular or physical sense of that term, this summary remedy cannot be applied. If it was intended to operate as it has been used in this case, it would not be confined to books and papers. It would extend to the public seals and the various other physical implements, without which the officer cannot act; it would be extended to the public room, desks, &c., attached to the office by law. Allowing this statute to be used in the way Conover has employed it, it would deprive the public of all the benefits designed by the common law doctrine of *de facto*. Whilst one claimant retained the room, the public seals, &c., the other claimant, by virtue of summary process obtained from a county judge, would carry off the books and papers to another place. Neither could then perform any service for the public. The official functions would suffer a total and complete paralysis.

Devlin's Case.

IV. The doctrine that in this summary proceeding the title to the office cannot be tried, has been perverted in this case to purposes precisely opposite to its end and aim. The doctrine is, that one in possession shall not be ousted in this summary way by reason of any supposed defect in his title. This is the whole length and breadth of the doctrine of officer *de facto.*

V. It was rightly argued before Judge Peabody, by Mr. Devlin's counsel, that he being a rival claimant, the office could only be disposed of, or any of the books and papers appertaining thereto awarded, by due judicial action in a *quo warranto* (5 *Hill*, 633). The principle was most singularly turned against the party who invoked it. The result of the proceeding was, that although Mr. Conover set forth his title on the record, and showed it to be bad, yet from a brief, transient, and contested occupancy he was held to be an officer *de facto*, and entitled to recover the papers from him who, for aught the judge knew or would venture to decide, was the officer *de jure*. 1. In any view of the case, Conover was not officer *de facto* (Burke *a.* Elliot, 4 *Ired. L. R.*, 361; Wilcox *a.* Smith, 5 *Wend.*, 233). 2. An officer proceeding to enforce his powers against an individual, can never, in such proceeding, sustain himself on the ground that he is officer *de facto*, if it appear that he is not officer *de jure.* (Cummings *a.* Clark, 15 *Verm.*, 657; Cornish *a.* Young, 1 *Ashm.*, 156, *& note;* Fowler *a.* Beebe, 9 *Mass.*, 235; 2 *U. S. Dig.*, tit. *Office & Officer*, 19–25.) 3. It is only as between third persons, one or both having acted on possession and apparent right, that the principle officer *de facto* applies. When the officer is himself a party, he must show that he is officer. 4. It is a monstrous perversion of the law on this head to say that a claimant, after two or three days alleged possession, may go before a justice, show that he has himself no right or title to the office, virtually admit that the party proceeded against has a good title to it, and that the justice may thereupon take the books and papers from the hands of the lawful officer and deliver them to the illegitimate pretender.

VI. It is too plain a proposition for serious argument, that the appointment of Mr. Devlin was valid and that that of Mr. Conover was void.

INGRAHAM, F. J.—The petitioner is brought before me on the

return of a habeas corpus, allowed on his petition, and the sheriff returns that he holds him in custody by virtue of a warrant for his arrest issued by Mr. Justice Peabody, under the statute which authorizes proceedings for the delivery of the public books and papers in the office, to the successor of any one dying or otherwise vacating the office.

The proceedings before Mr. Justice Peabody were instituted on the complaint of Daniel D. Conover, claiming to be the successor of the late street commissioner, Taylor. In his complaint he avers that he was appointed to such office by the governor of the State; that he has received the commission; that he has taken the oath of office and filed the necessary bond; and has done every thing necessary to qualify himself therefor. The section under which this proceeding was taken, is section 61, tit. 6, ch. 5, pt. 1, of 1 Revised Statutes (p. 115). This section provides that if any person appointed or elected to any office shall die, or his office shall in any way become vacant, and any books or papers belonging or appertaining to such office shall come to the hands of any person, the successor to such office may in like manner as thereinbefore prescribed, demand such books and papers from the person having the same in his possession; and the same being withheld, an order may be obtained for such delivery. It also provides, that in case of omission of the person so charged to make oath of the delivery of all such books and papers so demanded, such person may be committed to jail, and a search-warrant issued, &c. The petitioner was arrested under such a commitment, and confined in close custody in the jail of the city of New York.

By section 43 of the act relative to writs of habeas corpus, the power of a judge on the return of such a writ is limited, and he is directed to remand the prisoner, except in certain cases therein specified. Those cases which are applicable to this petition are:

1. When the jurisdiction of the officer has been exceeded.

2. When the process has been issued in a case not allowed by law.

3. When the process is not authorized by any provision of law.

Although separately stated, these different cases are all included within the term "jurisdiction;" and the question which I am called upon to decide is, whether, upon the papers presented to Mr. Justice Peabody as the foundation of the proceedings

which resulted in the commitment of the petitioner, there were facts stated sufficient to bring the case within the provisions of the statute so as to authorize the justice in the proceedings which subsequently were taken therein.

This proceeding is a special one, summary in its character, severe in its operation, and as we have seen in the late action of the Supreme Court in denying the petitioner an opportunity of reviewing the decision of the magistrate, conclusive in its results, and condemning the prisoner to a perpetual imprisonment if from any cause he is prevented from complying with the order directing the delivery. Being of this character, it should be construed strictly; there should be no doubt of the sufficiency of the facts to make out the jurisdiction, and there should be no presumptions entertained, other than the facts warrant to make out such jurisdiction. If the papers do not show the matters stated in the law as necessary to obtain the order from the magistrate, then no jurisdiction was conferred on him which would sustain the subsequent proceedings.

What then is necessary for this purpose?

1. The death of the incumbent. As to this there is no dispute.

2. That the books or papers shall come to the hands of any person. This is stated in the petition, as to the petitioner, although no time is stated when such books and papers came to his possession. It may well be doubted whether the mere possession is sufficient without showing that the possession was not obtained after the appointment of the successor. The words of the act are, however, so general that I should hesitate before adopting the conclusion that such defect was one that deprived the magistrate of jurisdiction. Whether, on the proof of the fact before him, it was proper to grant the warrant, it is not within my province to decide.

3. The appointment of a successor, the demand by him, and the withholding of the books and papers by the person charged, complete the facts necessary to make out a jurisdiction.

It is to the questions arising in regard to the matters stated as necessary under the third head, that the arguments of counsel before me have been principally directed, and it is to the examination of these questions that I shall confine myself at this time.

In the outset of the examination, the counsel for the respondent submits as an objection to any conclusion different from that

of Mr. Justice Peabody, that it is my duty to recognize his decision as the law of the case, and that inasmuch as he had decided that he had full jurisdiction of the matter, it is my duty to remand the prisoner forthwith, even if I was convinced that such jurisdiction was not established. I do not see in the opinion of Mr. Justice Peabody that the question of jurisdiction was distinctly passed upon by him in deciding this case. If not, then there is no force in the objection. But as the counsel has stated such to have been the case, I shall take it for granted that the question was decided by him. If such a course as is suggested by the counsel could with propriety be adopted by me, I should feel thereby relieved from the labor of further examining this case, and from the expression of any opinions which might conflict with those of that justice of the Supreme Court. The argument receives additional force in my own mind from the recollection that my decision in the first instance is sustained by the Supreme Court of this district. Upon more mature reflection, I have come to a different conclusion. The liberty of the citizen is involved in the application, the authority to entertain the proceedings for the delivery of the books and papers is placed by the same statute in the justice of the Supreme Court and the first judge of this court; either one in acting acts only as a magistrate out of court, and the decision of either is not to be regarded as the decision of the court to which he belongs, but of himself individually, as a magistrate merely, and not of a court. Nor can I suppose that any magistrate would for a moment entertain the opinion that any want of that comity and respect which is due to his decisions is shown when another magistrate discharges a duty which is made obligatory by law, and from which he cannot depart without exposing himself to the highest censure. For my own part, I should be thankful if in any case like this, involving the close imprisonment of a citizen, any other magistrate, if convinced of my errors, should by his decision correct them.

In the case of the People v. Yates (4 *Johns.*, 318, and S. C., 6 *Ib.*, 333), it appeared that Yates was committed by the Court of Chancery for contempt, and was discharged on habeas corpus by a justice of the Supreme Court; and although his decision was reversed by the Supreme Court, it was affirmed in the Court of Errors by a large vote. In that case also, by a second com-

mitment by the Court of Chancery, Yates was again discharged from imprisonment by the same judge; and although the chancellor, who had originally committed Yates for the contempt, acted as a member of the Court of Errors on the review of the case, and complained of the powers conferred by the law on inferior magistrates, yet he never ventured the suggestion that such magistrates were bound to take the law of the superior tribunal and refuse to interfere, although satisfied that such decision was erroneous.

I am referred to the case of the People *a*. Orser, sheriff (12 *How. Pr. R.*, 550), as showing that the justice of the Supreme Court refused to reverse the decision of a general term of the Common Pleas, where a person was committed for a contempt. In that case, however, the question was one of practice in the court, and the rules of practice are within the power of the court. Where the general term had settled by their decision what the practice should be, it could not with propriety be the subject of review on habeas corpus.

In the case of Yates, Judge Spencer, referring to the right of review, says, " It has been intimated that the Court of Chancery is a court of such high jurisdiction that it was incompetent for a judge of this court either to intermeddle with its process, or question the legality of its proceedings." With all due deference for such an opinion, I cannot subscribe to it. In every case arising on habeas corpus, the sole inquiry ought to be, " Is the prisoner legally or illegally in custody?" and not what court committed him. He also says, " It will readily be admitted, that in reviewing a question which has been passed upon by one of the highest judicial characters in the State—a question involving a right to exercise a jurisdiction claimed by that officer—there ought to be a liberal courtesy: it should not, however, be indulged so far as to lead to a surrender of the prerogatives of another judicial department, nor to the demolition of personal liberty." I am confident the learned judge who conducted the proceeding in this case would not thus limit the power of magistrates on this writ, and would ask no more authority for his decision than the respect which is justly due to it, both for his personal character and his position. There can, I think, be no doubt that a magistrate thus called upon by the law to decide as to the legality of the imprisonment of a citizen

is bound to examine into the case submitted to him, and if he becomes convinced on such examination that the imprisonment is unauthorized by law, to discharge such prisoner, even though in such examination he should arrive at a conclusion different from that of the committing magistrate.

This brings me to the question of jurisdiction, and upon the views that may be entertained of the construction of the statute under which the prisoner was committed must rest the decision of the question. It is conceded by all the counsel, and the decisions are uniform on the subject, that the proceeding for the delivery of books and papers cannot be used for the purpose of establishing the title of any one to the office to which the books and papers belong. This can only be done on a *quo warranto*. The right of Conover to the office of street commissioner cannot be affirmed by any decision made therein, nor would the claims of Devlin be in any manner invalidated by an order to deliver over books and papers in his possession. Nor could the proceedings, in my judgment, be with any more propriety resorted to for the purpose of deciding between two claimants for the same office, who shall for the time being hold the books and papers. Until it is decided who is the party legally entitled to the office and its appurtenances, the statute is not to be resorted to, to give to one a control which is only to be obtained by taking it from the other. The point must be settled that the applicant is the successor before his petition can be acted upon; and where the complaint of the applicant shows either that his own title to the office is doubtful, or that the person from whom he claims the delivery of the books and papers also claims to hold the same office, neither is in a position by which he can take from the other books and papers under this statute until his right to be such successor is established : much less can one who shows a defective title to the office claim to take such possession. Such is the decision of Mr. Justice Peabody in this case. He says : " It was never intended by the Legislature to authorize a justice of this court sitting here to decide in effect the title of an office. If there is a reasonable doubt as to who is entitled, it should be decided in a direct proceeding for the purpose." Such was the opinion of Justice Bronson in the People *v.* Stevens (5 *Hill*, 615), where he says : " The relator should first establish his title to the office by a direct proceeding for that purpose, and then his

right to the books and papers would follow as a matter of course;" and again, " If the relator is in truth the clerk, he may apply to a judge and be put in possession without delay. If his title is clear, he has a complete remedy by applying to a judge for an order to deliver the books and papers." So also thought Judge Kent in the same case, on a subsequent application to him for the books and papers, when he held the case was not one falling within summary jurisdiction conferred by this statute. He says : " It is obvious to me that the Legislature never intended the judge should exercise this power to enforce the delivery of books and papers against an officer *de facto*, where the title of the applicant to the office is questionable. He must have a *prima facie* title to the office, free from reasonable doubt (People *a.* Stevens, 5 *Hill*, 615, *note*)." An officer acting under the statute in question has no right to grant the order prayed for, unless the title of the applicant is clear and free from reasonable doubt; and that learned judge considered that the fact of there being another claimant for the office, and that the judges differed in their views of the claimant's title, was sufficient evidence that the claimant's title was not free from doubt, and denied the application. So, also, Judge Willard held in the matter of Carpenter (7 *Barb.*, 57), where he says : " If the petitioner has no title to the office, other objections are superfluous. Even if a reasonable doubt existed as to the title of the office, a judge at chambers ought not in this summary way to dispose of the question." This proceeding was only intended to provide for cases where the applicant had a *prima facie* title to the office, and the defendants were clearly and incontestably wrong ; and in the matter of Whiting (2 *Barb.*, 518), Justice Edmonds says, if it could be made to appear that the governor and senate had no right under the constitution to make an appointment, then the complainant's *prima facie* right to the possession would necessarily fall to the ground and his application be dismissed. I refer to these decisions as being all made by learned judges of the Supreme Court as to their powers under this statute, in all of which they agree that the statute was only intended to be used for a person having a clear and undoubted title to the office, and not where the claimant's title to the office was doubtful, or where more than one claimed a right to the possession of the books and papers by virtue of an appointment to the office.

It is proper to add, that when those questions depend upon matters of fact to be proved before the officer, his decision upon them is conclusive, and cannot be reviewed by habeas corpus. With the decisions of Judge Peabody on matters of fact I cannot interfere, and over them I possess no power of review. It is only to the papers submitted to him as the foundation of the proceeding that I can look, in this inquiry after the jurisdiction necessary to sustain the warrant. If on those proceedings it appear that the claimant is not entitled to maintain them, the jurisdiction fails.

It has been urged that color of title was sufficient to sustain jurisdiction, and to some extent I concede that rule to be proper. If it appears by the application that the claimant had been appointed to the office, and was in possession thereof, and it did not appear that any other person claimed to have a right to the same office, such a state of facts would have been presented to the justice of the Supreme Court as to give him authority to institute an inquiry and try the same, if disputed, by taking testimony : his decision thereon, whether erroneous or not, could not be reviewed except on a *certiorari*, and a judge having the matter before him on habeas corpus would be bound to remand the prisoner. But in this case the claimant not only sets out his own title to the office, but also shows that the party in possession of the books and papers claims to hold the office himself, by virtue of an appointment which at least shows as much color of title as that of Conover, and upon the face of the papers presented to the judge there appears at once the defect which all the judges above referred to have pronounced to be fatal, viz.; that the claimant has not a clear title to the office which he claims to hold, and therefore cannot obtain the order for the books and papers demanded.

The judge, in his view of the construction of this statute, seems disposed to exercise the power conferred by it in a case having less right even than color of title ; for he says, I am inclined to go further than those cases, and limit the application of this proceeding to cases of possession merely, that the question of title should not be tried at all, and that the abstract right of the applicant is unimportant where possession is clearly shown. Such a view of the act is directly at variance with the decision of the judges to whom I have referred, and cannot, in my judg-

ment, be sustained. If it be correct, it would allow any one who obtrudes himself into an office to obtain possession of the books and papers of the office without right or authority, and deprive the public thereof, to the great and manifest injury of the public interests. The successor to an officer who is deceased can only be the person legally entitled to succeed him. The fact of succession does not depend upon possession, but upon title, and the law can only know one legal successor, and that is the man entitled by law to hold the office which he claims. If he has not the right to the office, he is not the successor of the previous officer; he is a mere intruder, and whenever the right of the party to the office is established, the intruder will be ousted, as having no right, and not entitled to any of the emoluments.

So far as third persons might suffer if this want of right extended to them, the law for their protection holds the acts of such a person while *de facto* in office valid, but no further, and no right or claim for himself or as between him and the public can ever be made good. As to every thing else but the acts performed by him with third persons during the time he was actually in the office, the law annuls and renders them of no effect. Such a person can never be called the successor of another. He is not the officer—he does not succeed as officer, and merely succeeding in the possession and not in the right to an office cannot give any authority to exercise the rights and powers which the law gives to the successor.

The question then arises, was Mr. Conover the successor of Taylor as street commissioner at the time of this application? I have already stated as my opinion, that to be such successor within the meaning of the statute, he must have been legally appointed to the office, and that a mere possession of the office without such right, would not entitle him to the granting of his application. The complaint upon which Mr. Justice Peabody acted in granting the order, shows that Mr. Conover claimed the office of street commissioner by virtue of an appointment by the governor of the State of New York. Having stated in such complaint his title to the office, it becomes necessary to inquire whether the governor of the State possessed the power to make such appointment. If he did not, then the claimant showed affirmatively that he had no right to the office, but was a mere

intruder, and was not entitled to the books and papers which he sought to obtain; while, on the other hand, if such appointment was legal, Mr. Conover showed good title to the office, and showed also the possession of it sufficient to give the necessary jurisdiction.

The office of street commissioner is not a new office. So long ago as 1830 it was recognized by the ordinances of the Common Council of the city of New York, under the title of street commissioner. (See Revised Ordinances of the Common Council, 1839, 35.) The street commissioner was then a mere city officer, established by the local authorities, subject to their control, discharging his duties solely under their direction, limited to the county as to his powers and duties, and deriving his compensation from the city treasury. This office was not mentioned in the various charters granted previous to that of 1849. In the charter of 1830, the Common Council was directed to organize and appoint distinct departments to transact the executive business of the city. (Charter of 1830, § 21; *Davies' Laws*, 302.) Shortly thereafter, in pursuance of such provisions, an ordinance was passed, organizing this department under the title of the Street Commissioner's Department, and placing at its head the street commissioner. (See ordinances of the Common Council above cited.) This department was continued by the ordinance of May 9, 1839, after which the ordinances of the Common Council continued in force without being re-enacted triennially, as was formerly necessary. In the charter of 1849 the department is continued, with the same title and the same officer at its head, but with enlarged powers (see charter of 1849, § 19; *Davies' Laws*, 207); and by an ordinance of the Common Council, passed May 30, 1849, the department was reorganized and the former ordinances were repealed. This office of street commissioner, as established by the Common Council as a city office, was repeatedly recognized by the Legislature as in existence under the city government, although not provided for by any statute. In 1830 (see *Laws of* 1830, *ch.* 2), the street commissioner was authorized to sell lands for assessments, and from that time numerous acts may be found down to 1849, in which the existence of the office is recognized. (See *Laws of* 1846, *ch.* 326; *Laws of* 1841, *ch.* 170, 230; *Laws of* 1843, *ch.* 235.) After 1849, the office became elective, but the same office was

continued with increased powers, and has so remained until this time.

It must be apparent from these facts that the office of street commissioner was a purely local office under the city government, depending for its existence on a corporation ordinance, and for twenty years and longer having no other source of existence, but as such recognized by various acts of the Legislature, until it was made permanent by the charter of 1849. The addition to the office of new powers and duties did not change its character. It still remained a city office as originally established, calling for the performance of the duties originally charged upon it, increased with the growth of the city to its present magnitude and importance, but in other respects remaining the same office. Sustaining such a character, the provisions of article 10 of the constitution, section 2, apply, requiring that all city and county officers not otherwise provided for therein, should be elected or appointed by the local authorities as the Legislature should direct.

It is urged that section 5 of the same article, which says that the Legislature shall provide for filling vacancies in office, allows a different mode of appointment. That section must be read in connection with section 2 of the same article, that confines the appointment of local officers to the local authorities, and when the Legislature is required to provide for filling vacancies in office, they are required to make such provisions in the mode and by the authorities to whom the appointment of local officers is to be confided.

It is not pretended that down to the year 1849 any power existed by which the governor of the State could make an appointment of street commissioner. In that year (*Laws of '49, ch.* 28) an act was passed authorizing the governor, whenever any vacancies should occur in any of the offices of this State, where no provision was made by law for filling the same, to fill such vacancy until the commencement of the year after the next annual election at which such officer could be elected.

There are two objections to the application of this statute to the street commissioner's office. One is, that it is not an office of the State. It is not recognized as a State office in the Revised Statutes (1 *Rev. Stats.*, 96), which designates and classifies the various offices of the State, although in existence at the time of

passing the act, and is not in any statute recognized as a State office. The second objection is, that by the constitution such an officer can only be appointed by the local authorities or elected by the people, and the power to make the appointment cannot be vested in the governor. The opinions of the judges of the Court of Appeals, in the late case of the police commissioners, concedes this to be the case in regard to city officers, without any dissent. There is also force in the objection that the statute only applies to elective offices, as the period for which such appointee can hold office until the commencement of the year after the first election at which such officer could be elected. If the office is not elective, this provision would be a nullity.

But even if a contrary construction might be given to the act of 1849, I am forced to adopt the conclusion that, by the charter of 1857, other provisions are made for the appointment of this officer. By section 19 it is provided that the mayor, comptroller, and counsel shall be elected, and the other heads of departments shall be appointed by the Mayor, with the advice and consent of the Board of Aldermen. Under any ordinary construction this clause would vest in the Mayor and Board of Aldermen the power of appointment. But it was urged that the power so confided is only exercised by the mayor and aldermen elected under that act. I do not consider that charter to be so limited. It must be remembered that by section 54, all other charters except the Dongan and Montgomerie charters are repealed. If the powers conferred by the new charter are only to be exercised by officers who may be elected under it, we are forced to the conclusion that there is no authority for any city government. It is true, by section 51 the present officers are continued in their offices, but, unless under this statute, these officers (the aldermen and councilmen) could not pass any ordinances or do any legislative act. The Board of Councilmen is not included in either of the old charters, and possesses no powers not conferred by this charter, and I am not willing to suppose that the Legislature intended to terminate the city government, or to suspend its operations until the next year. The rational conclusion is, that the Legislature intended, when they retained the Mayor and Common Council and heads of departments in office, also to give them power to discharge their duties,

not under the charters which were repealed, but under the charter which continued them in office, and ratified that continuance down to the time when their successors should be elected and qualified. If the Common Council and heads of departments are authorized to act under this charter, there is nothing which prevents the mayor and aldermen from exercising the power conferred upon them. There is nothing in the statute expressly prohibiting the exercise of those powers, except the power of removal, and where the continuance of the powers of government to the public authorities of the city depend solely upon the new charter of 1857, there can be no other conclusion than that the Legislature intended to confer all the powers provided for therein, which are not expressly prohibited, on the officers so continued. The argument on the part of the respondent is, that the power of appointment conferred by section 19 is confined to the mayor and aldermen to be elected under the charter, and not to those in office. If this be so, then the same argument applies to the aldermen and councilmen. Section 2 vests the legislative power in the Board of Aldermen and Councilmen, and section 3 provides for their election in entirely different districts from those now represented by these officers; no more power to act at this time under the charter is given to these officers than to the mayor and aldermen in regard to appointments, and the same section which continues the present aldermen and councilmen continues the mayor in office. Unless they can act under this charter, all legislation during the year is a nullity; and if the Common Council can act and perform the duties provided for in this charter, the same right belongs to the Mayor and Board of Aldermen in regard to appointments.

In the opinion of Mr. Justice Roosevelt on one of these cases,[*] he gives as a reason for refusing to interfere by injunction, that the street commissioner might be removed by the Common Council, or by the mayor and aldermen, and he refers to section 21 of the new charter as authority therefor. Although he overlooked section 51, which prohibited such removal by the mayor and aldermen, still it shows his construction of that charter to be that the present officers exercise all the powers con-

---

[*] The Mayor, &c. a. Conover, *Ante*, 171; see 181.

ferred by it, except when otherwise specially provided.   By section 20, the counsel or comptroller may be removed by the governor, and the vacancy is to be filled by the Mayor and Board of Aldermen.   Should such removal be made during the present year, the city would be left without any such officers, if the construction contended for by the respondent's counsel is the correct one.   Under this charter it was deemed necessary to provide in section 51 of the charter of 1857, that certain officers there named should not be removed during their present terms of office.   All other authority to remove them was expressly repealed by the repeal of the charter of 1849, and no power of removal existed except that conferred by section 21 of the charter of 1857; and yet to prevent the street commissioner and other officers from being removed under that section, such a provision was thought necessary.   It may be said that such removal might be made after the present year, when a new mayor shall be elected; but the provision is general, and applies as well to the terms for the present year as for the succeeding ones. Section 32 also shows that the business of the departments was intended to be carried on under the new charter by continuing the existing ordinances in force, and making them to apply to those departments.

It has been said that those ordinances provide for filling vacancies therein, and therefore apply to this office.   There may be weight in this suggestion, but I prefer resting my construction of this charter upon the broad ground that the Legislature never intended to stop the government by repealing the old charters, without conferring new authority; but, on the other hand, when they repealed the charters of 1830, 1849, and the amendments thereto of 1851 and 1853, and at the same time continued in office the public authorities, they intended that their powers should be exercised in conformity to the new charter of 1857.

With these views, therefore, I adopt the conclusion that the governor not only obtained no power under the act of 1849 to appoint a street commissioner, but that the power to make such appointment in case of vacancy was conferred by the new charter upon the Mayor and Board of Aldermen, who are retained in office by that charter, and whose powers can only be exercised in conformity therewith.

I have, in the examination of these questions, come to the conclusion that the proceeding under which the prisoner was committed was not one in which the officer had jurisdiction, because the person claiming the office showed upon the face of his papers that his appointment was unauthorized, and conferred upon him no authority to take or hold the office, and because he sought on the face of his complaint to take such books and papers from another who claimed to hold the office by a better title than himself. That as the title of the claimant to the office cannot be tried and adjudicated in such a proceeding, the Legislature never intended that it should be used except in a case of a clear and undisputed appointment or election, and that as these facts appear upon the complaint submitted to Mr. Justice Peabody, for the purpose of giving the jurisdiction necessary to maintain this proceeding, they show the application to be made by a person having no right to institute it, and therefore conferred no jurisdiction.

It is perhaps not necessary for me to add, that I entertain great doubt as to the sufficiency of the demand stated in the complaint, and the same words as used in the warrant. The terms used—" the books and papers appertaining to the street commissioner's department"—appear to me far too general to warrant the commitment and imprisonment of any person who does not comply with the demand or order. The same terms are used in the warrant by which he is committed, and as that imprisonment is to continue until the order is complied with, some more specific description of the books and papers should be given, in order that the prisoner might know what he had to deliver, or might have some means of showing that he had complied with the terms of the order. Where a party is committed to close custody until he performs some act or complies with some order, the act to be performed or the order to be complied with should be sufficiently specific in its provisions to leave no doubt as to its requirements. That so general a description of the books and papers demanded cannot be sufficient, appears more clearly from the fact that the statute requires the magistrate to issue a search-warrant to seize the property, to be directed to a sheriff or other officer. Can an officer be required to assume the responsibility of executing such a warrant? or if he do, can he execute it by taking those things which he thinks

belong to the street commissioner's office? Section 11 of the Bill of Rights expressly provides that no search-warrant can issue unless it particularly describe the place to be searched and the things to be seized. I see no reason why this section is not as applicable to a search-warrant for books and papers belonging to the street commissioner's office as for any other property. The warrant to commit and the search-warrant should be equally specific in describing the property. In these conclusions I may have differed from learned judges who have expressed opinions on these questions, and if I entertained doubts upon them, I should be disposed to yield my own judgment to theirs; but I feel, also, that in all cases I am called upon to form my own judgment, and especially where a party is deprived of his liberty, I am not permitted to do otherwise than act upon the conclusions to which I have arrived. I have the satisfaction of knowing that any error can be corrected by another tribunal without injury to the public interests; and if it exists, it is in favor of the liberty of the citizen, whose imprisonment might, under the circumstances, be perpetual.

The prisoner must be discharged.

